Rueein, Chief-Justice,
 

 after stating the case as above, proceeded: — Upon the trial, several points were made by the defendants, on which his Honor gave opinions, in which it is insisted there was error,to correct which, is the object of the present appeal.
 

 There is no' dispute about the receipt of the money by Boche from
 
 Stephens,
 
 the Cashier of the Bank of Newborn, nor that it was his duty to enter it as a deposit to the credit of
 
 Stephens
 
 as Cashier. . But the court having rejected evidence, offered by the plaintiffs, of the recent of payment of the money by the State Bank to the Newbern Bank, it was., insisted, that, without proof of such payment, the plaintiffs could not recover in this action.
 

 The defendants also prayed the court to pronounce . the bond void, either wholly or in part, as not being au-thorised by the charter, but contrary thereto. On both points, the decision was against the defendants. .
 

 On the first, nothing scarcely need be added to what observed as to the nature of Bank deposites in the case of
 
 the' State Bank v. Armstrong, (ante page
 
 519.) The money', when received by the Cash- , , . • , , J . ,. „ ier
 
 Loche,
 
 _became incorporated into the mass of proper-jy which belonged to the plaintiffs, and which by the
 
 *534
 
 plaintiffs was confided to bis. care. It was not, in his bands, the money of the Bank of Newborn, nor his own; but was the money of the State Bank, for which, that institution,.ahd not
 
 Locke,
 
 teas responsible to the depositor. . "When he loft the-office, he was bound to leave there all . that had been deposited there,to enable his employers to meet the engagement assumed through him. It is therefore immaterial whether the depositor has called,or shall ever call upon the plaintiffs for the money. The right of 'the.plaintiffs depends upon its having been paid into, the Bank,and upon-Xoc/ce’s-h'aving withdrawn it for purposes not-thoso of the Bank. The argument, cannot be ad- ' mitted for a moment, that when a Cashier withdraws-from á Bank, he lms a right to carry, with him all 'money in deposito and keep it until the Bank shall have -satisfied the depositors'. .With what are their demands to .be satisfied, when the Cashier has the funds ?
 

 The second objection arises under the general issue and is founded on the sixth fundamental article of the ninth section of the Bank charter.' The words óf it are: “Every Cashier, before he .enters upon, the duties .of his. •Tbffice; shall be-required to give bond with two or more ■ “ sureties to the satisfaction of the directors, in a sum not
 
 “
 
 less than $10,000, with condition for his good beba-“viourN ..'The. terms of .the bond' on which this-snit has been brought have been already mentioned. It is insisted, that a corporation is bound to act in strict conformity to its charter, and that acts and contracts not authorised b.y it arc void, or at all events,' those are which do not. conform to the charter, in.those cases in which the charter does prescribe particularly the form-; or subject matter of.the contract; and .that.here the second provision for settling and paying over the monies, is an addition to that mentioned in -the charter, and a- . voids the wliole-bond, or at least, that the matter added is-void.. " .
 

 . The objection supposes that the bond taken, varies sitbstantially in the condition from that mentioned in' the act, for it is not supposed to be argued that it must be confined to its very words. That'would make it al
 
 *535
 
 together inoperative, since the act does not say in so ma-11 y w°rds, in what respects, or as to what duties the Cashier shall be oí good behaviour. The variance is suPPosed t° consist in the difference
 
 between
 
 “good be-haviour” and “accounting, settling and paying over all monies” — the former only referring to integrity, and the latter including capacity, diligence, and ability to pay. The authority on which this distinction is taken, is the case of the
 
 Union Bank v. Clossey,
 
 (10
 
 John.
 
 271,) in which that doctrine is laid down, and it is held, that overpaying a check by mistake was not a breach of a bond “well and truly to perform the duties of the office of teller.”
 

 The breach here, is the omission of the plain duty of entering on the books of the Bank a credit to a customer's account, by means of which omission, the Cashier was enabled to escape being charged, as between himself and the Bank, with the sum which ought so to have been credited, and also enabled to retain to his own use, until it was a long time afterwards otherwise discovered. This could not, we think, he good behaviour, in any sense of that term. If he was not obliged duly and skilfully to enter the credit according to the approved methods of book-keeping, ho was at least obliged, as a man of integrity, to enter it in some way. But to us it seems, that the construction of those words, contended for by the counsel, is not the true one. The object of the Legislature was to have the institution secured in the performance of all the acts which were incumbent on the Cashier as duties. The State took a largo interest in the Bank, and private citizens embarked their money in it, at the invitation and upon the faith of the State. It cannot be supposed that mere honesty of purpose, or rather the absence of dishonest intentions, on the part of the Cashier, was all the State meant to require, but further, skill, diligence, punctuality — for these qualities are necessary to the duties on the discharge of which the success, nay the existence of the institution essentially depended. The doctrine of the case from New-York cannot prevail over these reasons, if that doctrine were
 
 *536
 
 such it is supposed to be. In the-' case of
 
 Minor
 
 v.
 
 the Mechanic's Bank of Alexandria,
 
 (1
 
 Peters' Tep.
 
 46,) it was held that the words, “well and truly execute the clu-tics of the office of Cashier,55 includes not only honesty, but skill and diligence. These words are the same as those in the bond sued on in
 
 6ithe Union Bank
 
 v.
 
 Clossey;”
 
 which was then cited and relied on. But the doctrine of the case in New-York, is not that supposed, "as we think. The case before the Court was that of a mistake -in the Teller, and found to be really such, in the count of money. It may be true that those words do not form a guaranty against all mistakes,or imply the utmost and perfect, but only reasonable capacity and diligence; and therefore that an act which eren a careful and' very competent person may.commit, would not amount to nonperformance. But until the mistake be shewn on tiro part of the defendants, the omission to make any entry whatever, cannot he regarded as good behaviour, and the omission to account for the money in any way, cannot butbe considered as a culpable omission. So that the breaches here, appeared to be breaches of that part of the condition which does conform to the charter; as well' as of those which are more specific as to the particular duty of payment. Nor do we think these latter words import that the Cashier shall pay, at all events, all the monies that might come to his hands, so as to insure against accidents, robbery, or the like. If they were not qualified by other words in the bond, they would be subject to a reasonable construction, according to-the subject matter, and receive a sense consonant to. the previous general provision relative to good behaviour, so as to-make' the obligation to account, an obligation for faithful accounting. But they are expressly qualified. The Cashier is to account for, settle and pay all monies, “ which
 
 he ought
 
 to account for, settle and pay over
 
 in virtue of his
 
 officeThis is not adding a duty beyond good behaviour, but only .the expression of one of the particulars, which constitute that general duty, and which cannot vitiate the obligation, in respect of the previous words.
 

 
 *537
 
 If, however, the provision had been a new and substantive one, out of both the words and sense of the char-we spou](| st¡¡l think it binding. It is true that a corporation is the mere creature of the law, having no natural existence, and therefore no original power to 'contract. That power, is necessarily derived from the charter. But it does not follow, that the charter must ‘specify every contract that may be made by the corporation, or the mode and form in which it shall bo made.
 
 As
 
 a matter of necessity, its capacity to contract is only said to arise out of the charter, because the origin and existence of the corporation — the ideal being which contracts — arc derived from, and depend on the charter. But when once called into existence by law, its power to contract generally, or only to make particular contracts for specified purposes and in specified forms, will depend upon the purposes of the incorporation, and the enabling and restraining clauses in the charter. When the charter is by statute, as here, expressly creating certain persons, when associated, a body politic in law and in fact, able and capable in law to purchase and possess estates, real and personal, to a certain amount, and “generally, to do and execute all acts, matters and things, which a
 
 body' politic
 
 in law may, or
 
 lawfully
 
 can” — there is given to this impersonal being the general faculty of contracting, which persons by law-have, though the mode of contracting may be different. To these words however, are added, “subject to the rules, regulations, restrictions and provisions hereafter prescribed and declared,” and in the ninth section it is subjoined that the following rules, restrictions, limitations and provisions,shall form the fundamental articles of the constitution of said corporation, among which is the provision, before quoted, for taking Cashier’s bonds.
 

 To shew that within the intention of the Legislature, the capacity of the corporation to make each particular species of contract, does not require an express grant, it is only necessary to advert to the phraseology of this article. It requires the Cashier to give bond in not less than $10,000; yet it does not profess to confer on the
 
 *538
 
 corporation the power to take it payable to itself, nor to take one in a greater penalty, though it is apparent that the sum mentioned is not adequate security in a Bank with so large a stock, and that the Legislature expected that a larger would, and ought to be required.
 

 But the argument is, that the words are restrictive, and that a contract not conforming to it, is void. The effect of this argument, if sound, would be serious. The appointment of the Cashier would itself be avoided, and as the Bank can only deal and be dealt with through agents, and he being illegally inducted, is notthe agent, and all contracts through him would be null. This consequence would go far to prove the reasoning fallacious. We deem the construction contended for, not to be the true one. The clause seems to us not more restrictive on the corporation than it is enabling. The object was not to impart the faculty of making a contract with the Cashier and two sureties for him, for his faithfulness in office, and to make the appointment of one without bond void ; nor was it to restrain the general faculty before imparted, to that of taking security in a particular sum or form. Another purpose was in view* The act incorporates all the subscribers to the Bank, including the State, as the largest stockholder. It then vests in the President and Directors, as a select body of the corporators, powers which make that board, as it were, the acting corporation for the ordinary purposes, and general management of the corporate affairs. The intention was to guard the mass of the stockholders from the assumptions, negligence or mistakes of that select body, as well as the mal-practices of the agents by them appointed, as far as was practicable. The same protection was requisite for the State and each member of the community, as being concerned in the credit and soundness of the institution. Hence, by the eighth section of the charter, it is enacted that the Directors of the principal Bank shall have power to appoint Directors for the branches,and such officers under themselves, as well as the branches, as shall be necessary for the business, and shall be capable of exercising
 
 *539
 
 such other powers ami authorities for the well-govern- and ordering the affairs of the corporation, as shall be fixed and determined by the laws and ordinances of the same; which bye-laws are-not to
 
 be
 
 contrary to law, and subject to the restrictions of the charter. Then follow a number of provisions in the next section, which are called fundamental articles of the constitution of the. corporation. They arc obviously of different natures. Some of them prescribe the mode of action, and limits to the powers of the whole body of stockholders, such as the times of general meeting, the mode of voting, and the scale of votes,, and the number, of Directors to bo chosen for the principal Bank. Others, relate to things which neither the whole body can authorise, nor the select body do, with or without such authority; and others, obviously impose duties on the Board of Directors, as practically conducting the business, .or declare limitations on that body in the exercise of those functions.— Thus in the course of their trading, they are forbidden to hold real estate, except under certain circumstances; to contract debts beyond a fixed sum; from dealing except in specified articles ; from committing usury; from making loans to the United States .or a State; from withdrawing the capital from the brandies. They are required to make dividends, to submit a state of the Bank to the Stockholders in general meeting, to appoint Directors and officers of the branches, and to cause discounts to be made, and deposites to he received there, upon the same terms as at the principal Bank, to cause the Cashiers to make weekly statements to the Board of the condition of the Bank, and to furnish the Treasurer witli a similar statement, when required, not exceeding one in three months.
 

 These are obviously functions of aBoard of directors, and therefore the mandates concerning them are to be considered as spoken to that board. So of the duty of taking bond from the Cashier. The Directors appoint that officer by the express provision of the charter.— They therefore are to take the security, which lie is required to give. If the Board fail to take any security,
 
 *540
 
 or such as is prescribed, it is criminal in the persons composing that body, and they would be amenable, probably, to the State and to the whole- corporation. It may be too, that at the election of the State, upon a judicial proceeding, the charter might be-adjudged forfeited for such disobedience to the law in even this'small portion of the corporation, as the board is in possession of the funds of the whole corporators, and exercises
 
 de facto,
 
 according to its. chartered organization, the most ' important of its franchises. These questions 'however, are not at all involved in tiiis cause, and even the hypothetical solution of them, cither in the affirmative or negative,' must not be considered as intimations of an opinion upon them. But admitting that the Board ought to take the security, and that the members of it arc responsible for not doing so, and taking it for granted that the sovereign might hold all the stockholders to be involved in the default of those, to whom the sove,reign requires them to commit their affairs; yet the enquiry recurs, whether an officer thus appointed by the' Board of Directors, would not be liable to the action of the whole corporation, for any wrongs committed by him, or upon any contract entered into by him with the whole corporation. If his appointment be illegal and void, it is nevertheless incredible, that he may under color of it, get the funds and effects into his hands, and defy the world. The corporation is not
 
 de facto,
 
 upon such a breach of duty by the Directors, dissolved; and until dissolved, may prosecute all those who do it wrong, and enforce all contracts entered into with the corporation itself. If for instance, deeds for lands, contrary to the statute, were taken, they would be valid as against the vendor. If not, the charter is an
 
 absurdity;
 
 for ifvoid the charter could-not be violated in that respect, since the Bank could never acquire the estate, the acquisition of which constitutes the offence. A Cashier, like another wrong-doer, would be liable in trover, for the effects in his hands, if they could be identified. If they consisted of monies not identified, there is as little doubt that he would be liable in assumpsit, for money had and recciv-
 
 *541
 
 ej; as 0¡;jiei. persons are, who get money of another w‘^10u^ consideration. In thousands of instances, corporations have had judgments on counts for money had and received. If a Bank send money by an individual to another Bank, and he convert it, or one steal it, surely it is impossible that there is no remedy for such a wrong. If the party be liable for money had and received» it is a case of implied contract. The law supposes every contract it implies, to have been in fact made; it infers that the promise was made, because it oughtto have been. But it never thus inferred, if in law it could not be made between the parties. If those positions be true, and a corporation can, as it has often done, maintain assumpsit for money had and received to its use, then although the Board of Directors, may have violated a duty incumbent on that body, by not taking a proper bond, the whole corporation may yet have redress upon any other contract, proved or presumed, by which the Cashier has become bound to the whole corporation for his transactions, particular or general. A liability on a promise to pay a particular sum, does not stand on a different footing from one on a covenant and bond to cover all sums, which he has received, or may receive. There is an ability in the wholo corporation to make a contract of either kind, and the liability depends on the terms of each contract. Here the Cashier has been admitted into oflice, and has possessed himself of the assets of the corporation, and has given a bond,which, in its terms, covers the demand; and he is therefore bound by it. The true purpose of the fundamental article was to require the Cashier to give a bond, and to require the Board of Directors as a body, distinct from the mass of the stockholders, and from necessity, entrusted with
 
 their interests, to
 
 take a bond payable to the whole corporation. This requisition is addressed peculiarly to the Board, for the protection of the other corporators, including the State.— it is mandatory to that body, but a compliance by that body is not a condition, of which the performance must be shown, to give the corporation itself an action upon a contract with it. The clause is not an enabling one
 
 *542
 
 to tlie whole corporation to make the contract described in it, nor is it restrictive of the general faculty of the whole corporation; chartered for the purposes of banking, and as an instrument of commerce, and providing a circulating medium, which will avoid a contract wit!) it in another form. It is therefore the opinion of the Court that the jury was properly instructed upon this point.
 

 The next error alleged relates to the case made under the pleas of payment. The money was received in 1816, and was never entered in account. While Mr.
 
 Locke
 
 remained in office, the books and papers of the Bank were open to the Directors, and he rendered to the Board weekly statements; and upon his resignation in 1821, a particular account was made up, from which his successor settled with him, when he fell in arrear, a considerable sum, which has since been discharged. This sum of §1355, not appearing on the books, was not brought into that settlement; and was not discovered until 1830, when Mr.
 
 Locke
 
 was asked for an explanation, and said he could make none, unless he had paid it to the Newbern Bank at Charlotte.
 

 His Honor charged the jury, that a presumption of payment arose from the lapse of time, between 1816 and 1830, but that it was repelled, if the error had not been discovered before 1830: that each of the breaches assigned in the declaration were distinct causes of action, and if the plaintiff failed on that of 1816, there might yet be a verdict on that of 1821, for not paying over the money ; and that as to this last, the time being less, than the ten years before this suit, there was no presumption of payment.
 

 The court has been somewhat embarrassed by the manner in which these propositions were stated in the Superior Court. We do not agree in the opinion, if, as it seems, it was meant to lay down, that one, having a distinct and complete cause of action touching an entire sum, ascertained at a particular day, and being barred of that action by the presumption of payment, from efflux of time since that day, can, because the lia-
 
 *543
 
 ^ility arises on a covenant or bond, with a condition to account, by a subsequent demand, create a new breach anc* a ncw caus0 °f action, and thereby avoid the effect of the time, and former presumption altogether. Upon the proof, the demand upon each breach, is substantially for tiie same sum of money. Although the plaintiff may fail on one,' and recover on the other, and to that extent they are distinct; yet upon the evidence, the whole sum only can be recovered on all or either. Tim same debt therefore is demanded in each. Now the presumption we are speaking of, is that- of
 
 payment.
 
 If the money is
 
 once paid,
 
 there is. nothing more to be demanded, and so there cannot be a second breach committed by the non-payment on the second demand. This presumption of payment supposes it was made at the beginning of the time, for it is the lapse since, that puts the proof of the debtor’s power, or raises the inference against the creditors, that he would not have waited so long,, if he had not received satisfaction. "We should therefore have held it erroneous to say, that as to the non-payment in 1821, which is one of the breaches, there was no presumption in favor of the defendants, if it were true, that such presumption ran as to the breach of 1816. It is indeed correct to say, that the time does not raise the presumption, that the money was paid in in 1821, because it is less than ten years. But there would be a presumption that it was,paid before, namely in 1816, when the first breach in relation to this same sum is alleged. "Wo concur indeed with his Honor, that the whole presumption is rebutted by the ignorance of the error, and therefore if the case were before us,, ■on a motion for a new trial, because the verdict was unjust, or against evidence, we should refuse it. But it is reviewed here for error in law, and we are unable to see whether the jury found the verdict upon the breach in 1816, because the presumption was rebutted, or upon that laid in 1821, because against that there was no presumption. We are however led upon reflection to conclude that the first error in the Superior Court, con
 
 *544
 
 sists in supposing, that there was in cither case the presumption contended for; and that the jury ought to have been told there was nothing to-raise it.
 

 The fact pleaded, is payment or satisfaction, It is said that it is established by the lapse of time. That rule is familiar in its application to bonds, merely for the payment of money, or doing particular acts on a day or days certain, or even on demand. Then each party knows his rights and obligations, and they are distinctly unconnected and in opposition as debtor and creditor. But when one is bailiff or receiver of the other, there is during the continuance of that relation, and until an accounting between them as to their transactions up to the period embraced in the account, no legal presumption, as an arbitrary and settled rule of law, that the receiver has paid to the principal all the monies or any particular sum before .received for him.— Why ? Because the duty of the receiver is, in that case, not merely to pay to the other the money as a debt which he owes him ; but it is also, until demanded, to keep it for him as his money. Until an accounting and some payment thereon, the presumption is that the Cashier of the Bank did
 
 not
 
 pay the money to the stockholders or for the use .of the corporation, as between them. There was no person to receive it but himself, and therefore it remained in his hands. That presumption becomes a certainty, if Ills own accounts, which he was bound to keep truly, contained.no entry of such payment during his agency, nor even an acknowledgement by him that lie has received the money, which he now contends must be deemed,upon mere presumption, to have been ¡¡aid by him, while thus in office. It is manifest, we think, that there is
 
 nothing
 
 for such a presumption to vest on. The only possible reliance the defendants could have on time, was the presumption, not of -satisfaction, but that the demand itself never existed; that the money was never received. That would have been a legitimate argument, though it would probably have availed but little against the direct written evi¿ dence under his own hand. That however would bo
 
 *545
 
 altogether a presumption o£ fact, with the decision of hy the jury, this court could not intefere. No question was made on it at the trial, or alluded to by ^ie Judge. Upon the question made, it is thought clear by this court,that until the defendant
 
 Locke
 
 ceased to be Cashier, there was no presumption tiiat he paid to the plaintiff any monies of which entries do not appear on the books kept by him; but on the contrary, that, as it was his duty to keep those monies, the presumption is, as against himself, that he did keep them and has used them. When he gave up his office and came to a settlement with his successor, that settlement raised a presumption that all demands were then included, or had before been settled, until the contrary appears. And as to the presumption from time, on which alone the question was raised in this case, it did not begin before the settlement. But the day of the settlement is in our opinion a
 
 puiictum tampons,
 
 at which the parties hold the relation of debtor and creditor, and that only ; and from which alone any presumption of satisfaction could now run, and from which it did arise and would protect the defendants, if the time had been long enough and there bad been nothing to repel it. But being less than ten years, it was in itself insufficient. We speak of that settlement as the first accounting, because there is no evidence of any other. It was urged in argument indeed, that there was a weekly accounting. But that is surely a misapprehension: at least we cannot understand the case in that way. The “weekly statements,” spoken of by the witnesses, must be those statements mentioned in the fourteenth fundamental article in the charter. They are
 
 “statements of the
 
 amount of stock of the particular office and of the debts due the same, of the monies deposited therein, of the notes in circulation, and of the cash in hand.” This does not mean a detailed account of all the items composing those general accounts, such as a list of the debtors ami depositors and a description of the money, upon which the board is to settle with the Cashier. But only a balance sheet, or what is familiarly called in Banks or
 
 *546
 
 among merchants,
 
 a stale of the Bank
 
 or of the House, by which the aggregate amount of its assets and engagements may be seen, and its present cash means appear. Tlic use of it is simply to enable the persons engaged in the management of the Bank to regulate the discounts for the day and order its general dealings for the ensuing week. It purports to shew what the condition of the Institution is, according to the books, and what it ought tó be, upon the supposition that all its debtors are good and its officers faithful. But it supposes nothing as to those facts, nor does it purport to be an account between the Bank and the Cashier, nor to prove that the money that, according to if, ought to be in the Bank, is there. It is not an account
 
 to or with the
 
 Bank; but is a compendious account
 
 of
 
 the Bank, as the Cashier says it is, precisely of the same character with that required by the same article, in the same words, to be rendered by the officers to the Treasurer for the information of that officer and the Legislature, upon which no particulars appear or are expected to appear.
 

 There was certainly no necessity for a further demand ; as that implied by accounting, in 1821, was for every thing.
 

 The remaining question is on the defect of the verdict in not responding to the special pleas. If those issues be material, the verdict is imperfect and there must be a
 
 venire de novo ;
 
 but if immaterial, the jury would have found for the defendants on them unnecessarily, and the plaintiffs would still have been entitled to judgment
 
 non obstante ver dicto.
 

 Upon the defence constituted by the facts as pleaded or as proved, in another court, we do not propose to> make a suggestion. But upon its sufficiency at law, we have not the least doubt or hesitation. The pleas are substantially taken from those in the
 
 Trent Navigation Company
 
 v.
 
 Harley
 
 (10
 
 East.
 
 34.) That caséis an authority directly against them. Lord
 
 Elleuborough
 
 unfortunately dropped the observation, that “none of the pleas appear to have been proved in fact,” which it ia
 
 *547
 
 feared has led to some mischief. But if they had -been l,,'ove^ **1 fart they would liare been unavailing. Baron
 
 f.yogtif
 
 on the trial, ruled tliat the case made in the plea was no defence at-law, and it came or in the King’s Bench on a rule for a new trial foi* that error. The counsel for the plaintiff were stopped; and the court held clearly, that no
 
 laches
 
 of the obligees, in not examining the accounts or not calling on the principal, was an es-toppel to proceeding at jaw against the sureties. No such estoppel was known of. This is precise authority upon the point, that one who is surety by obligation, though his character appear in the instrument, cannot avail himself of
 
 Inches
 
 by the creditor, at law at least, if he can in equity, for
 
 laches
 
 is neither performance nor a release, and all the obligors are bound alike. In
 
 Bultrel
 
 v.
 
 Jarrold,
 
 (8
 
 Price's Exchequer Rep.
 
 467.) an action of debt was brought in the Court of Exchequer on a recognizance of bail entered into by
 
 Bultrel
 
 as bail of
 
 Rowe,
 
 and the defendant pleaded that the plaintiff-without his privity, came to an agreement with Ilowe,where-by he gave him time and was to receive payment in goods, which were consigned to him accordingly. It was held bad on demurrer, because such a parol agreement v itli theprincipal could not discharge the obligation arising on matter of record. Upon this judgment error was brought in the Exchequer Chamber, where it was affirmed, Error was again brought in the House of Lords, where it was again affirmed in 1820, without a dissent on the part of any Judge; and Lord
 
 Eldon
 
 remarking that the plaintiff in error, must seek his remedy in equity. That court can enquire into the solvency or insolvency of the principal, when it took place, whether the surety has an indemnity or has been injured by either laches, or the insolvency, or only by his own negligence. In 1821, the case of
 
 Davy
 
 v.
 
 Pendergrass,
 
 (5
 
 Barn.
 
 &
 
 Alder.
 
 187,) was decided in the King’s Bench, accordingly. It was debt on bond, executed by S. & J. P. and the defendant as surety, with condition to pay within one month after demand of such balance, not exceeding ¿6500, as upon settlement between
 
 *548
 
 tho plaintiff and principals, S. and J. P. should appear to lie due the plaintiff for coals to be delivered to S. & A J. P. The breach was the non-payment of a sum thus demanded. Oyer and plea, that the plaintiffs had by parol agreement, ’without the privity of the surety, given time to the principals to pay by instalments, and taken a warrant of Attorney to take judgment, and issue execution for the whole upon default of payment of any instalment. On demurrer, there was judgment for the plaintiff. The whole court went on the ground, that that debt, arose by deed in which the principal and sureties bound themselves for the same act and nothing would discharge it as to one which would not as to the • other. It was distinguished from mercantile or parol con tracts, as guaranties, bills of exchange, and the jurisdiction of bail bonds, under the statute. It was not performance, for then the principal himself might plead it; nor a release being in pais. Nothing inputs can discharge an obligation but performance or satisfaction. The remedy upon all such agreements is in equity, as it is in the case of laches. These authorities fully support the opinion we entertain, and on which the court founded the judgment in
 
 Binford
 
 v. Alston, at last term.. The 'case of
 
 The People
 
 v.
 
 Janson, (7 John.
 
 332,) is a respectable authority to the contrary ; but it is not sufficient to change the common law. It has not met with the decided approbation of the profession in New-York, and is shaken by the subsequent case of
 
 The People
 
 v.
 
 Berner,
 
 (13
 
 John.
 
 383,) in the same State; and the Supreme Court of the United States denied its correctness, and refused to follow it in
 
 United States
 
 v.
 
 Kirkpatrick,
 
 (9
 
 Wheat. 737.)
 
 The courts in this State, have never yielded to the innovation, but have steadily held to the settled rule of the Common Law.
 

 Per Curiam. — Judgment aeeirmeb.